UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| IN RE: SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION SERVED ON AMERICAN RESORT DEVELOPMENT ASSOCIATION<br><br>in the EASTERN DISTRICT OF TENNESSEE CASE OF<br><br>DIAMOND RESORTS U.S. COLLECTION DEVELOPMENT, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>WESLEY FINANCIAL GROUP, LLC and CHARLES WILLIAM MCDOWELL, II,<br><br>      Defendants. | No. 3:24-MC-11-DCLC-DCP |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636(b)(3), the Rules of this Court, and Standing Order 13-02.

Now before the Court is the Motion to Compel and Incorporated Memorandum of Law in Support Thereof ("Motion to Compel") [Doc. 1], filed by Wesley Financial Group, LLC ("Wesley") and Charles William McDowell, II ("McDowell").[1] The American Resort Development Association ("ARDA") filed a response in opposition to the motion [Doc. 10]. Defendants filed a reply [Doc. 13]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS** the motion [**Doc. 1**].

---

[1] Wesley Financial Group, LLC and Charles William McDowell are the Defendants in the underlying litigation. For ease of reference, the Court will refer to them as "Defendants."

I.  BACKGROUND

On June 6, 2020, Diamond Resorts U.S. Collection Development, LLC, Diamond Resorts Hawaii Collection Development, LLC, and Diamond Resorts Management, Inc. (collectively, "Plaintiffs") sued Defendants Wesley and McDowell in this Court, *see Diamond Resorts U.S. Collection Dev. LLC v. Wesley Fin. Group, LLC*, No. 3:20-cv-251 [Doc. 1] (E.D. Tenn. June 8, 2020).  According to the allegations in the Amended Complaint, Plaintiffs market, sell, and manage vacation destinations throughout the world [Doc. 103 ¶ 1].  Plaintiffs allege that Defendant Wesley is an unregulated business whose sole purpose is to cancel another business's valid and enforceable contracts [*Id*. ¶ 2].  They claim that Defendant Wesley has made a business of and monetized the tort of tortious interference with contract and that it targets and disrupts valid contracts between timeshare developers and their customers [*Id*.].  Defendant McDowell is Defendant Wesley's founder and Chief Executive Officer ("CEO") [*Id*. ¶ 4].  Based on the above allegations, Plaintiffs allege false advertising under the Lanham Act, 15 U.S.C. § 1125(a), violations of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101, *et seq*., and engagement in the unauthorized practice of law pursuant to Tennessee Code Annotated § 23-3-103 [*Id*. ¶¶ 82–130].

According to the Declaration of Robert Clements, ARDA's Vice President for Regulatory Affairs and General Counsel, "ARDA is the trade association for the timeshare industry" and "is a nonprofit, nonpartisan, member driven organization that promotes and advocates on behalf of the timeshare industry" [Doc. 10-1 ¶¶ 1–2].  Its membership is comprised of over 350 companies that includes privately held firms and publicly traded corporations, such as "developers, exchange companies, vacation clubs, timeshare resellers, timeshare owner associations (HOAs), resort management companies, industry vendors, consultants, and legal and regulatory experts" [*Id*. ¶ 3].

According to Clements, "ARDA's mission is to advance the public-policy objectives of the timeshare industry. ARDA's motto puts it best: 'We stand up for timeshare. When an issue arises that affects the industry, ARDA is there.'" [*Id.* ¶ 4]. Clements describes ARDA's activities as follows:

> ARDA engages in advocacy on public-policy issues at all levels of government. ARDA engages in extensive lobbying at the local, state, federal, and international levels to ensure that the interests of the timeshare industry are effectively represented within the legislative process. ARDA routinely meets with and educates legislators, policymakers, regulators, and the public on the issues affecting the timeshare industry.
>
> ARDA seeks to provide a unified voice for the timeshare industry. ARDA regularly communicates with and fosters discussions among its members on policy issues so that it can reach common policy positions, devise tactics and strategies, and execute by addressing the issues through advocacy.
>
> ARDA regularly communicates with its members to advance these objectives. ARDA's communications with its members are necessary and central to ARDA's mission. ARDA would be unable to effectively advance its objectives without full, robust, unqualified communications and discussions with and among its members. ARDA's communications with its members occur through a variety of means, including meetings, telephone conferences, as well as electronic communications and email discussions.

[*Id.* ¶¶ 5–7].

Clements also describes ARDA's efforts against what he refers to as "timeshare exit scams" [*Id.* ¶ 8]. Clements states that they "have had a significant adverse impact on the timeshare industry" [*Id.*]. He describes them as "involv[ing] companies that seek to take advantage of timeshare owners through fraudulent and deceptive actions, including false promises of modifying, cancelling, or transferring timeshares in exchange for an upfront fee that entices timeshare owners

3

with false offers to purchase" [*Id.*]. With respect to ARDA's efforts against timeshare exist scams, Clements submits:

> ARDA advocates for public policies and government action to protect consumers and timeshare companies against timeshare exit scams. ARDA has communicated with its members regarding the risks to consumers and the timeshare industry posed by timeshare exit scams and the companies involved in them. ARDA has also advocated before legislators, policymakers, regulators, and others regarding timeshare exits scams and the risk posed to consumers and the timeshare industry by such exit scams.
>
> In particular, ARDA has made presentations to the offices of state attorneys general regarding the risks to consumers as well as timeshare companies presented by timeshare exit scams and the companies that are involved in them. ARDA has communicated with its members regarding its meetings with state attorneys general, has shared draft slide decks and presentation materials related to such meetings, and has solicited and obtained feedback from its members regarding tactics and strategies to effectively message and communicate the public-policy position of ARDA and its members. These communications and discussions have been critical to reaching a common policy position on the issue of timeshare exit scams, to devising tactics and strategies to address the issue, and to executing and addressing the issues through advocacy efforts.
>
> To address the issue of timeshare exit scams, ARDA also worked with several of its members to establish the Coalition for Responsible Exit. Through its public website, ResponsibleExit.com, the Coalition for Responsible Exit educates timeshare owners on timeshare ownership and how they can responsibly and safely exit their timeshares and also avoid exit scams.

[*Id.* ¶¶ 9–11].

On October 29, 2020, Defendants served a subpoena on ARDA ("First Subpoena"), seeking "[a]ll documents or communications exchanged between you and [Plaintiffs], including any of your officers or directors employed by [Plaintiffs], concerning [Defendant] Wesley Financial Group, LLC's advertisements or alleged deceptive and unfair trade practices" [Doc. 10 p. 2]. According to ARDA, Defendants' "counsel agreed that the temporal scope of the single

request in the First Subpoena was limited from October 17, 2015, to October 17, 2019" [*Id*.]. ARDA represents that it responded to the First Subpoena on December 7, 2020 [*Id*.].

On June 30, 2023, Defendants served a second subpoena ("Second Subpoena") on ARDA [Doc. 1-2 pp. 5–8]. The Second Subpoena is identical to the First Subpoena, "but the temporal scope was expanded from October 17, 2019, to the present" [Doc. 10 p. 2; *see also* Doc. 10-2]. On July 28, 2023, ARDA responded to the Second Subpoena as follows:

> ARDA objects to the request as overbroad. ARDA further objects to the request to the extent it imposes an undue burden on ARDA, is disproportionate to the needs of the case, and seeks information that has been or can be obtained from parties to this litigation. ARDA further objects to the request as vague and confusing in so far as the phrase "alleged deceptive and unfair trade practices" is not expressly defined. ARDA further objects to the request as it impinges ARDA's First Amendment privilege without a compelling justification and exceeds the scope of any justification that may be asserted. ARDA is a private advocacy organization that exists for expressive purposes and engages in political speech, advocacy, and association. Compelled disclosure of political and expressive affiliations, associations, and activities to a public-advocacy opponent impinges on First Amendment rights and must be justified. *See, e.g., Buckley v. Valeo,* 424 U.S. 1, 64 (1976); *Perry v. Schwarzenegger,* 591 F.3d 1147, 1160 (9th Cir. 2009); *AFL-CIO v. FEC,* 333 F.3d 168, 175 (D.C. Cir. 2003). The Subpoena seeks disclosure of ARDA's political and expressive affiliations, associations, and activities, and there is no countervailing interest sufficient to justify this impingement on First Amendment rights. Subject to and without waiving the foregoing objections, ARDA will produce non-privileged documents or communications exchanged between ARDA and Diamond responsive to the request.

[Doc. 10-2 pp. 2–3]. On August 8, 2023, ARDA produced a privilege log containing approximately 26 documents, asserting that they are subject to the "Associational Privilege, First Amendment" [Doc. 10-3]. The Second Subpoena is the subject of the instant dispute.

On January 31, 2024, Defendants filed their Motion to Compel in the Middle District of Florida [Doc. 1]. ARDA filed an unopposed motion to transfer the action to this Court [Doc. 3].

5

On February 21, 2024, United States Magistrate Judge Embry J. Kidd granted ARDA's motion and transferred this matter [Doc. 4]. The matter was opened in this Court on February 26, 2024 [Doc. 5]. On March 10, 2024, ARDA responded in opposition to the motion [Doc. 10], and on March 14, 2024, Defendants filed a reply [Doc. 13].

Defendants seek an order compelling ARDA to fully respond to the Second Subpoena they served "and to produce documents that ARDA improperly withheld pursuant to a purported First Amendment associational privilege" [Doc. 1 p. 1]. For grounds, Defendants claim that ARDA has not made a prima facie showing that the associational privilege applies to the 26 withheld emails [*Id*. at 9–11].

ARDA responds that it has satisfied its initial burden in showing that the associational privilege applies [Doc. 10 pp. 9–15]. Given that it has established its initial burden, ARDA contends that the burden shifts to Defendants to show "the heightened compelling interest standard of the First Amendment associational privilege framework" [*Id*. at 16–17]. Even if Defendants could demonstrate the relevancy of their request, ARDA states that "Defendants must first pursue alternative sources of discovery[,]" and they "have not explained why the discovery must be obtained from ARDA[,]" as opposed to other sources, such as Plaintiffs [*Id*. at 18]. ARDA contends that Defendants' discovery is not relevant or proportional to the needs of the case [*Id*. at 18–20]. It also seeks its attorney's fees pursuant to Rule 45(d)(1) of the Federal Rules of Civil Procedure [*Id*. at 20–21].

Defendants deny that ARDA has satisfied its initial burden [Doc. 13 pp. 3–9]. Even if ARDA had satisfied its initial burden, Defendants argue it has demonstrated that their interest in obtaining this information justifies disclosure [*Id*. at 9–12]. With respect to ARDA's objection to relevancy, Defendants assert that ARDA did not previously raise this in its objections to the Second

6

Subpoena, and therefore, it is waived [*Id*. at 12–13]. To the extent the Court considers this objection, Defendants state that "the requested documents easily fall within the standard for relevancy under Rule 26(b)(1)" [*Id*. at 13 (citation omitted)]. Defendants assert that ARDA's request for attorney's fees should be denied [*Id*. at 13–14].

## II. STANDARD OF REVIEW

"The Supreme Court has long 'acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues.'" *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 479 (10th Cir. 2011) (quoting *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 295 (1981)). "[B]ecause some collective efforts to express ideas will only be undertaken if they can be undertaken in private, the Supreme Court has recognized a privilege, grounded in the First Amendment right of association, not to disclose certain associational information when disclosure may impede future collective expression." *Id.* (citing *NAACP v. Alabama,* 357 U.S. 449, 462 (1958)).

Courts now recognize "a First Amendment privilege when discovery requests infringe on a party's associational rights." *Tree of Life Christian Sch. v. City of Upper Arlington*, No. 2:11-CV-00009, 2012 WL 831918, at *2 (S.D. Ohio Mar. 12, 2012) (citations omitted); *see also Pulte Home Corp. v. Montgomery Cnty.*, No. GJH-14-3955, 2017 WL 1104670, at *3 (D. Md. Mar. 24, 2017) ("These First Amendment protections apply in the context of discovery orders."). Because this "privilege is not absolute, . . . courts typically balance the interest in disclosure and the burden imposed on association." *Id*. (citation omitted). First, the party asserting the privilege must "demonstrate an 'arguable first amendment infringement.'" *Tree of Life Christian Sch*, 2012 WL 831918, at *3 (quoting *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010)). To satisfy this burden, the party "must 'demonstrate an objectively reasonable probability that disclosure will

chill associational rights.'" *Id*. (quoting *Independence Inst. v. Gessler,* No. 10–cv–00609, 2011 WL 809781, at *2 (D. Colo. Mar.2, 2011)). Courts may consider "whether disclosure will result in 'membership withdrawal, discouragement of new members, or other consequences which objectively suggest an impact on the members' associational rights." *Id*. (quoting *Perry,* 591 F.3d at 1160).

If the party meets its burden, then the burden shifts "to the party seeking the discovery to "demonstrate an interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of association." *Id*. (quoting *Perry,* 591 F.3d at 1161). In this analysis, the court should "balance the burdens imposed on individuals and associations against the significance of the interest in disclosure." *Id*. (quoting *Perry*, 591 F.3d at 1161). And there are several factors to consider when balancing such burdens against disclosure: "(1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information." *Id*. (quoting *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164, 2007 WL 852521, at *3 (D. Kan. Mar. 16, 2007)).

### III. ANALYSIS

The Court finds that the ARDA has not established its prima facie case of an arguable first amendment infringement. Further, although ARDA did not object on relevancy grounds, the Court finds that the information Defendants seek is relevant to the issues in this case. In light of those findings, the Court finds it unnecessary to address ARDA's request for attorney's fees.

#### A. ARDA's Prima Facie Burden

ARDA states that it has met its initial burden to show an arguable first amendment infringement [Doc. 10 p. 9]. According to Clements, "the privileged documents and

8

Case 3:24-mc-00011-DCLC-DCP Document 14 Filed 04/01/24 Page 8 of 15 PageID #: 83

communications identified on ARDA's privilege log relate to discussions among ARDA and its members regarding drafts of presentation materials and preparations for presentations made by ARDA to the offices of state attorneys general regarding the risk and issues presented by timeshare exist scams and companies that are involved in them" [Doc. 10-1 ¶ 24]. ARDA claims compelling it to disclose such information (1) "will chill the candor of ARDA's internal deliberations," (2) "will discourage member participation in ARDA going forward, and" (3) "will reveal ARDA's strategies and tactics to a public policy opponent" [Doc. 10 p. 9]. Further, ARDA submits that "[c]ompelled disclosure of the deliberations among ARDA and its members on a critical public policy issue affecting their industry, timeshare exist scams, will chill communications among [it] and its members, will have a deterrent effect on the free flow of information within ARDA, and will adversely impact ARDA's core mission of advocating on behalf of the timeshare industry" [*Id*. at 10].

Defendants respond that "the Clements Declaration consists solely of the type of conclusory and speculative assertions that courts regularly reject as insufficient to establish a First Amendment infringement" [Doc. 13 p. 4 (citation omitted)]. Defendants state that the Clements Declaration does not "offer any actual evidence to supports its conclusory and speculative claims that disclosure will have a chilling effect on ARDA's rights" [*Id*.].[2]

In support of its position that disclosure will chill its expressive activities, including effective advocacy and member participation, ARDA relies on the Clements Declaration, which provides:

---

[2] Defendants rely heavily on *State of Washington v. Reed Hein & Assocs.*, No. 2020-CA2-3827 (D.C. Super. Ct. July 30, 2021), wherein the court found that ARDA did not meet its burden in establishing the associational privilege [Doc. 1-5]. But the court's order does not explain its holding other than to state "for the reasons set forth in [d]efendant's [o]pposition and oral argument" [*Id*.]. While the Court has reviewed the transcript and the defendant's opposition, it is not clear from those filings what evidence ARDA submitted in order to meet its burden.

9

The privileged documents and communications identified on ARDA's privilege log constitute internal deliberations regarding advocacy activities on a critical public-policy issue for ARDA and its members.

Compelled disclosure of the documents and communications identified on ARDA's privilege log will infringe upon the First Amendment rights of ARDA and its members and will chill the free exercise of the associational and expressive rights of ARDA and its members.

Specifically, the privileged documents and communications identified on ARDA's privilege log relate to discussions among ARDA and its members regarding drafts of presentation materials and preparations for presentations made by ARDA to the offices of state attorneys general regarding the risks and issues presented by timeshare exit scams and companies that are involved in them. The documents and communications identified on ARDA's privilege log include discussions between ARDA and its members, including Diamond, regarding ARDA's preparations for meetings with state attorneys general, include draft slide decks and draft presentation materials, and include feedback and discussion among ARDA's members regarding tactics and strategies to effectively message and communicate the public-policy position of ARDA and its members regarding timeshare exit scams. Limited portions of these privileged documents and communications reference Wesley and McDowell and their business practices.

The compelled disclosure of the privileged documents and communications identified on ARDA's privilege log will impair ARDA's ability to engage in effective advocacy as it will require ARDA to disclose internal and external communications regarding ARDA's strategies and tactics, including communications with its members and allies, to a known public-policy opponent of ARDA's advocacy activities. Wesley and McDowell, through the hiring of lobbyists, have opposed past advocacy efforts by ARDA to regulate the timeshare exit industry.

The compelled disclosure of the privileged documents and communications identified on ARDA's privilege log would undermine ARDA's ability to engage in effective advocacy, as well as coalition-building activities. In my experience, privacy and discretion are essential to effective associational advocacy, and that is especially true with respect to information concerning strategies and planning.

[Doc. 10-1 ¶¶ 22–26].

"While making out a *prima facie* case of harm is not heavy burden, non-parties 'must at least articulate some resulting encroachment on their liberties.'" *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07CV929, 2013 WL 6044333, at *7 (D. Conn. Nov. 14, 2013) (quoting *New York State Nat. Org. for Women v. Terry*, 886 F.2d 1339, 1355 (2d Cir. 1989)). Generally, as ARDA submits, courts have recognized that disclosure that discourages communications and participation may infringe on First Amendment rights [*See* Doc. 10 pp. 10–12]. But here, the Court finds that ARDA has not established its burden in showing that production of the documents will lead to an arguable first amendment infringement. To be sure, the Court has reviewed the portions of Clements's Declaration on which ARDA relies [*See* Doc. 10-1 ¶¶ 22–27]. These paragraphs, however, appear to be a mere recitation of the law without any substance. For example, in paragraph 25, Clements states that the production of documents will require ARDA to disclose "strategies and tactics" to a "public-policy opponent" [*Id*. ¶ 25]. "This purported harm, however, exists in virtually all discovery disputes. The *prima facie* burden of demonstrating harm would be rendered meaningless if mere aversion to disclosure constituted sufficient encroachment on a groups' liberties." *A & R Body Specialty & Collision Works, Inc.*, 2013 WL 6044333, at *7.[3]

Clements states that production "would undermine ARDA's ability to engage in effective advocacy" because "[i]n his experience, privacy and discretion are essential" [Doc. 10-1 ¶ 26]. He adds that production will "chill candid communications" because "the success of our advocacy

---

[3]     ARDA relies on *Whole Woman's Health v. Smith*, 896 F.3d 362, 373 (5th Cir. 2018), *as revised* (July 17, 2018), where the court noted, "Even more disturbing, this discovery order forces [the non-party] to turn over *to a public policy opponent* its internal communications, setting a precedent that may be replicated in litigation anywhere." But in that case, the non-party provided sufficient detail regarding how compliance chilled its First Amendment rights. *Id*.

11

and other activities depends on a free, open, and robust exchange" [*Id.* ¶ 27]. But these statements merely relate to ARDA's request for privacy. The associational privilege goes "beyond one's implicit desire for privacy." *A & R Body Specialty & Collision Works, Inc.*, 2013 WL 6044333, at *7. And Clements's Declaration does "not describe *how* the disclosure of information would degrade [ARDA's] ability to associate." *Id.* at *6; *see also Hisp. Leadership Fund, Inc. v. Walsh*, No. 112CV1337, 2014 WL 12586844, at *1 (N.D.N.Y. June 9, 2014) (finding that the declaration submitted by the plaintiff's president did "not sufficiently describe how the disclosure would debilitate [the plaintiff's] ability to associate" (citation omitted)).

ARDA argues that "Defendants' own conduct in the litigation demonstrates that Defendants will seek reprisal on ARDA and its members" [Doc. 10 p. 13]. It explains, "Following production of ARDA's privilege log, Defendants noticed an intent to serve a subpoena on every single timeshare developer that appears on ARDA's privilege log, as well as counsel that provide legal services to these timeshare developers" [*Id.*]. But ARDA has not cited to any authority showing that using the judicial process "constitute[s] 'reprisal' within the meaning of the First Amendment associational privilege" [Doc. 13 p. 7]. *See Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, No. A-15-CV-134, 2016 WL 5922315, at *6 (W.D. Tex. Oct. 11, 2016) (explaining that to meet its burden, "the party must show that disclosure will deter members of the association from maintaining membership due to fears of threats, harassment, or reprisal from either government officials or private parties").

Further, Clements states that compelled disclosure would "adversely impact participation" because "members or potential members would be reluctant to communicate if they knew or suspected that ARDA would disclose their private, deliberative communications" [Doc. 10-1 ¶ 28]. But he does not provide sufficient facts to support this statement. *Hisp. Leadership Fund,*

12

*Inc.*, 2014 WL 12586844, at *4 (finding the declaration, which stated, "disclosure of donor information would chill or even eliminate [the plaintiff's] ability to raise funds as [the plaintiff] will lose its contributors" was not sufficient to meet the prima facie burden); *cf. Perry*, 591 F.3d at 1163 (finding that the proponents met their burden by "presenting declarations from several individuals attesting to the impact compelled disclosure would have on participation and formulation strategy"); *Pulte Home Corp.*, 2017 WL 1104670, at *7 (finding that the non-parties met their burden by filing several affidavits, one of which noted that the declarant had observed representatives express concerns about "opening themselves and their organizations up to discovery in litigation").

As stated above, the burden to establish a prima facie case is not a heavy one, but the party relying on the associational privilege "must go beyond conclusory statements and demonstrate through proofs 'a basis for the assertions made.'" *Flynn v. Square One Distribution, Inc.*, No. 6:16-MC-25, 2016 WL 2997673, at *2 (M.D. Fla. May 25, 2016) (quoting *All. of Auto. Mfrs., Inc. v. Jones*, No. 4:08CV555, 2013 WL 4838764, at *1 (N.D. Fla. Sept. 11, 2013)). Here, Clements's Declaration is too conclusory to find that disclosure will discourage member participation or chill ARDA's other expressive activities. *See id*. at *3 (concluding that the chairman of the board's affidavit, which [was] the only evidence submitted in support of his motion, is not sufficient to satisfy his burden" and while there is not "any minimum number of pieces of evidence that must be submitted before a prima facie case of 'objectively reasonable probability' is established," his "affidavit, standing alone, [was] not sufficient"). Given this finding, the Court does not need to address ARDA's remaining arguments that Defendants cannot meet the heightened compelling interest standard of the First Amendment associational privilege framework [*See* Doc. 10 pp. 16–18].

### B. Relevancy

Defendants state that ARDA did not object to the Second Subpoena based "on relevance, undue burden, or any other grounds" [Doc. 1 p. 3]. In its response, ARDA claims that the Second Subpoena exceeds the scope of Rule 26 and that it objected on "other Rule 26 grounds" [Doc. 10 p. 19]. ARDA argues that its "internal documents and communications are not relevant, let alone proportional, to the question of whether Defendants committed deceptive and unfair trade practices or violated the Lanham Act" [*Id.* at 20]. Defendants reply that "ARDA did not object on relevance grounds," and therefore, it has waived that argument [Doc. 13 p. 12 (citation omitted)]. But even if the Court considers ARDA's objection, Defendants state that they have shown that the documents are relevant [*Id.*]. Defendants state that ARDA cannot claim any undue burden given that there are only 26 documents at issue [*Id.*].

The Court has reviewed ARDA's response to the Second Subpoena, and it does not assert a relevancy objection [*See* Doc. 10-2 pp. 2–3]. *See Thompson v. Paul G. White Tile Co. Inc.*, No. 2:20-MC-16-FTM-29NPM, 2020 WL 13389810, at *1 (M.D. Fla. Oct. 20, 2020) ("Generally, when a party or nonparty fails to timely object to 'interrogatories, production requests, or other discovery efforts, the objections are deemed waived even if a party had an objection to make.'" (quoting *Bailey Indus., Inc. v. CLJP, Inc.*, 270 F.R.D. 662, 668 (N.D. Fla. 2010)). But even if the Court considered its relevancy objection, the Court finds that the Second Subpoena seeks relevant documents. ARDA asserts that "Defendants have previously argued that discovery to ARDA is relevant because it relates to [the] contention that [Plaintiffs'] TCPA claim was not filed within the statute of limitations" [Doc. 10 p. 16 (citation omitted)]. Here, ARDA states that this rationale does not apply because in response to the First Subpoena, it produced documents before June 8, 2019, and the Second Subpoena seeks information from it after June 8, 2019 [*Id.* at 16]. According

14

to ARDA, "All of the privileged documents and communications withheld by ARDA are dated after October 17, 2019[,] and thus have no bearing as to whether [Plaintiffs] knew or should have known of [Defendant] Wesley's business conduct before June 8, 2019" [*Id*. at 17]. As Defendants argue, however, "it is the *content* of the documents at issue, not simply their *date*, that is important here" [Doc. 13 p. 11]. As such, "The mere fact that the 26 emails and attachments are dated after October 17, 2019, is not dispositive as to whether or not their contents show that [Plaintiffs] had earlier knowledge of [Defendant] Wesley's business practices" [Doc. 13 p. 11]. In light of this argument, the Court finds the Second Subpoena seeks relevant documents. *See Meredith v. United Collection Bureau, Inc.*, 319 F.R.D. 240, 242 (N.D. Ohio 2017) (explaining that the "scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad") (quoting *Lewis v. ACB Bus. Serv., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998)).[4]

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** the Motion to Compel [**Doc. 1**]. ARDA **SHALL** produce the withheld documents **within ten (10) days**.

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[4] ARDA has not set forth a basis as to why the Second Subpoena seeks information not proportional to the needs of the case.